## DONAHUE v. UNITED STATES.
### No. 6568.

Circuit Court of Appeals, Ninth Circuit.

Feb. 8, 1932.

SAWTELLE, Circuit Judge, dissenting.

N. D. Wernette, of Coeur d'Alene, Idaho, for appellant.

H. E. Ray, U. S. Atty., and William H. Langroise, Sam S. Griffin, and Ralph R. Breshears, Asst. U. S. Attys., all of Boise, Idaho.

Before WILBUR and SAWTELLE, Circuit Judges, and JAMES, District Judge.

WILBUR, Circuit Judge.

Appellant was convicted of operating a still, and he appeals from the judgment solely on the ground that the evidence adduced against him was procured by an unlawful search and seizure, and that the court erred in denying his motion to suppress this evidence. Upon the motion to suppress, witnesses were introduced on behalf of the appellant and on behalf of the government. The motion was denied as to appellant and granted as to a codefendant, one Rash, in whose favor the court ordered a directed verdict.

At the time appellant was arrested he and Rash were operating a still for the redistillation of moonshine whisky in a dwelling house upon a farm or ranch owned by appellant. It was contended by appellant that this was his private dwelling house when he was there, notwithstanding his residence elsewhere. He had lived there with his wife and minor children until September, 1929, when he moved his family to the town of Sandpoint, Idaho, about sixteen miles from the ranch, where he and his family continued to reside and where the children attended school. Appellant had employed Rash to operate the ranch for him and Rash moved into the dwelling house thereon in October, 1929. Appellant visited the ranch on an average of one or two nights a week and remained there more or less continuously during the hunting season. The theory upon which the trial court ruled upon the motion to suppress was that the dwelling house was the dwelling house of Rash and not of appellant.

The question involved is not that of the residence of appellant, which was clearly in Sandpoint, but is whether he was in fact actually using the dwelling house on the ranch as such at the time of the arrest and search. A man cannot have two domiciles (Goodrich on Conflict of Laws, p. 26), but he can have a residence in one place and actually occupy a dwelling place in another within the meaning of the term dwelling house as used in the statute (27 USCA § 39) limiting the right of search of dwelling houses. This house was actually being used by appellant as a dwelling house at the time of the arrest and search; that is, it was "occupied as such" within the mean-

ing of the statute, unless we adopt the theory that has sometimes been advanced [United States v. Apple (D. C.) 1 F.(2d) 493], but universally repudiated [see, United States v. A Certain Distillery (D. C.) 24 F.(2d) 557, 559, 560, and cases there collated], that appellant, by making the major use of the dwelling house that of manufacturing alcoholic liquor, in fact converted the dwelling house into a distillery or place of business within the meaning of the statute (27 USCA § 39), and that therefore his use of the premises as a sleeping place was not the occupation of the dwelling house as such. The government points out the statutory provision (27 USCA § 39) with reference to apartment houses, hotels, and boarding houses as indicating that a private dwelling house temporarily occupied as such is not a dwelling house within the meaning of the law regulating the search of private dwelling houses. The provision is as follows: "The term 'private dwelling' shall be construed to include the room or rooms used and occupied not transiently but solely as a residence in an apartment house, hotel, or boarding house." Title 2, § 25, National Prohibition Act, 27 USCA § 39.

We think, however, that the provision as to hotels, etc., does not modify the term "private dwelling" as applied to a farm house or individual house used as a dwelling.

On February 7, 1931, Sheriff Traue received information from one Atkinson, a neighbor of appellant, that appellant intended to make a second run of liquor at his ranch on Sunday, February 8, 1931. Atkinson told them that, if appellant was engaged in distilling liquor, the gate across the lane leading from the main highway would be padlocked. Acting on this information, the sheriff and a deputy and two prohibition agents went out to appellant's ranch. As they approached the house, to within a couple of hundred feet, they could smell whisky and also the odor of mash, and noticed that the outbuildings were locked. As they moved closer to the house the smell of liquor became very strong and they could hear the still in operation. Agent Webb testified that he has had ten years' experience seeing stills in operation; that the odor they noticed as they approached the house was the characteristic odor from a still in operation; that when they approached the kitchen door they knocked, but received no response; that they opened the door, which was unlocked, and could then see part of the still; that upon entering the door they passed through the kitchen to the door leading into the sitting room and saw appellant and Rash in the sitting room, with the still in full operation; that appellant made a move toward a rifle which was laying on a table, but, upon observing that the officers were armed, stopped, approached them, and said: "You fellows have got me right this time." The witness also testified that appellant stated Rash had nothing to do with the still, but was staying at the ranch to look after the cattle.

Appellant took the stand upon the motion to suppress and testified that he had made 60 gallons of whisky in the stillhouse in December, 1930, but never made any prior to that time; that the still was being operated in the dwelling house on the morning of February 8, but that there was no odor from it.

Atkinson, called on behalf of appellant, denied that he had told the sheriff on February 7, or at any time, that appellant was going out to his ranch on February 8 to run whisky a second time for the Elks, or words to that effect, and that he never had any such conversation with the sheriff, and that he did not say that, if the gate across the road was locked, it would indicate that appellant was operating the still. On cross-examination he testified that when he worked for appellant he was arrested and convicted of a felony.

On the ranch there was another building, about ten by fourteen, which was used as a stillhouse. It contained five barrels of 180 gallons capacity each; two 50-gallon barrels; a foundation for a still and apparatus, and five burners built into the frame and connected with pressure tanks in the garage. There was a distinct odor of mash coming from the stillhouse. In addition to the still, some 50 or 60 gallons of moonshine whisky were found in the dwelling house.

It must be conceded that the search of a dwelling house, as such, for a still is not authorized by the terms of the National Prohibition Act. Agnello v. United States, 269 U. S. 20, 32, 46 S. Ct. 4, 70 L. Ed. 145, 51 A. L. R. 409. It is contended, however, that this search was justified as an incident to the arrest of appellant for the commission of a felony in the presence of the officers. We have no doubt that the officers were justified in concluding from all the circumstances brought to their attention that there was probable cause to believe that a felony was being committed in their presence within the meaning of that term as used

in the law authorizing arrests in such instances. If the officers entered the premises for the purpose of making an arrest, a search would have been justified as an incident thereto. The difficulty we encounter in the record, however, arises from the fact that the officers do not expressly claim to have entered the premises for the purpose of making an arrest, but assert that their purpose was to "look for a still," as the following quotations from their testimony will indicate.

Agent Webb testified:

"Q. You went there with the intention of going up and going through the buildings to find whether or not—to extend your investigation to the extent of determining that there wasn't a still in those buildings in operation? A. We went there to look for a still.

"Q. That is what you intended to do? A. That was our object in going there—to look for a still.

"Q. The first place you headed for was the buildings? A. That is correct.

"Q. You intended to make a search of those buildings to find whether or not there was a still in operation? A. I intended to make a complete investigation—whatever was necessary to find the still.

"Q. You intended to extend your search to that extent? A. We usually do.

"Q. That is what you intended to do in this case? A. That is what we did do. We intended to find the still if possible when we left Sandpoint."

Agent Johnson testified: "I did not have any intention or form any intention of searching any of the buildings on the place, including the house or still house, before I smelled the operation of a still, or observed some visible sign of the commission of a crime. If a still is in operation you do not have to go out to find it. You can smell it a long ways before getting there. I didn't have any intention of searching the house until Hester called me in."

Sheriff Traue testified: "When we started out we did not go with the express purpose of going to raid and search Tom Donahue's place. We started for Tom Donahue's place and went out there for the purpose of finding out whether or not a still was operating there. We went out there to make an investigation and search the place if a search was warranted to find out whether or not a still was in operation."

It has been held that, where the real intention of the officers in entering the premises was to make a search and not to make an arrest, the search is illegal, although an arrest is actually made. Thus, in De Pater v. United States (C. C. A.) 34 F.(2d) 275, 276, 74 A. L. R. 1413, the court said:

"The sole question at issue is whether this evidence was obtained by an illegal or unreasonable search and was improperly admitted.

"In determining this question it is important that the controlling facts and circumstances surrounding this particular case be constantly borne in mind, and that the decision be limited to the exact point at issue. It will be observed at the outset that, when advised by their sense of smell of what was going on within the residence, the officers did not arrest De Pater, and that the search was not made as an incident of a lawful arrest, although he was admittedly the owner of, and in immediate control of, the premises at the time. * * * The search, therefore, was not an incident of a lawful arrest, and its legality is not in any way supported by evidence that there was a contemporaneous arrest upon disclosures revealed by the search."

De Pater was outside the building at the time of the entry, and of course could have been placed under arrest before entry, if that was the purpose of the arresting officers.

In Raniele v. United States (C. C. A.) 34 F.(2d) 877, 880, the court said: "But, passing by this lack of knowledge and lack of evidence that a crime was being committed in the presence of the prohibition agent, and assuming that his knowledge was such that he was authorized to enter the house and to make an arrest, and, as incidental to the arrest, was further authorized to make a search, this was not what he did. On entering the house he found a female of adult age, who said she was the woman of the house. No arrest was then made, but the prohibition agent proceeded to search the house by going to the basement, where he found the stills and other apparatus, together with the mash and moonshine. Thereupon he arrested the defendant. In others words, the arrest was incidental and subsequent to the search, instead of the search being incidental to the arrest. That the search and seizure under such circumstances and without a warrant was illegal, we think requires no argument."

In Temperani v. United States (C. C. A.) 299 F. 365, 367, prohibition agents detected an odor of mash emanating from the garage

beneath a certain dwelling. They forced an entry and discovered stills in operation and liquor and mash, but the defendant was not there. In holding the search illegal, Judge Rudkin, speaking for this court, said: "But here the offender was not in the presence of the officers; he was not in the garage, and they had no reason to suspect that he was there. Laying all pretense aside, the officers entered the garage, not to apprehend an offender for committing an offense within their presence, but to make a search of the premises to obtain tangible evidence to go before a jury, and whatever necessity may exist for enforcing the National Prohibition Act, * ᵛ * or other laws, the violation of rights guaranteed by the Constitution cannot be tolerated or condoned. If present laws are deficient in not permitting the search, in a constitutional way, of homes where intoxicating liquor is known to be manufactured, the remedy is with Congress, not in subterfuge or evasion."

This case is closely analogous to the case at bar, but differs from it in that the defendant in the case at bar was present in the building and was at once placed under arrest. It would be impossible, in the case at bar, to hold the arrest of appellant legal and the search thereafter made illegal, because such a search is a lawful concomitant of a legal arrest. Was the arrest legal?

The illegal manufacture of liquor is a felony. Act of March 2, 1929 (Jones Act, 45 Stat. 1446, 27 USCA §§ 91, 92). If the information which had reached the officers prior to the arrest and search, that is, prior to the opening of the door of the dwelling house, and the knowledge they had gained through their senses of smell and hearing, was sufficient to give them probable cause to believe that a felony was being committed in their presence, they were entitled to enter the dwelling and make the arrest, United States v. Borkowski (D. C.) 268 F. 408; McBride v. United States (C. C. A.) 284 F. 416; Janus v. United States (C. C. A.) 38 F.(2d) 431, 436; 28 USCA § 504, and, as an incident thereof, search the premises, United States v. Borkowski, supra (D. C.) 268 F. 408; Vachina v. United States (C. C. A.) 283 F. 35; McBride v. United States, supra (C. C. A.) 284 F. 416. See, also, Garske v. United States (C. C. A.) 1 F.(2d) 620, and cases there collated. That they had reasonable cause to believe that a felony was being committed in their presence is clear, and they therefore had a right to enter the premises for the purpose of making an arrest, and, as an incident thereto, to seize property found in appellant's control, which it was unlawful for him to have. Carroll v. United States, 267 U. S. 132, 161, 45 S. Ct. 280, 69 L. Ed. 543, 39 A. L. R. 790; Marron v. United States, 275 U. S. 192, 198, 199, 48 S. Ct. 74, 72 L. Ed. 231; King v. United States (C. C. A.) 1 F.(2d) 931; Mattus v. United States (C. C. A.) 11 F.(2d) 503.

The fact that the officers intended when they entered the premises to make a search of the premises for a still would not make the arrest illegal, if when they entered they were justified in so doing for the purpose of making the arrest which they did in fact make. Nor do we think that the failure of the officers, in their testimony, to assign as the purpose of their entry the making of the arrest, makes the arrest illegal. Nor does their statement that they intended to search for a still, if the fact justified it, necessarily eliminate the conclusion that they also intended to make the arrest when they entered the premises. It is familiar law that it is presumed that one intends to do that which he in fact does do. Therefore it is clear that the officers intended to make an arrest, and it is difficult to escape the conclusion that, before they entered the premises, they had formed the intent to arrest the individuals found operating the still. It is not reasonable to conclude that the intent to arrest the appellant was first entertained after the premises were entered, and that therefore the officers intended to make an unlawful entry to search, when they had a right to make a lawful entry for the purpose of making an arrest. Presumptions are in favor of the legality of the actions of officers rather than their illegality. If the officers had negatived this presumption by expressly stating that when they entered the kitchen of the dwelling house they did not intend to make an arrest, but did intend to make a search, such evidence would no doubt make the search and entry illegal; but, when their acts reasonably show an intent to make an arrest, in the absence of an express declaration to the contrary, it must be assumed that when they entered they intended to do what they did do.

The motion to suppress was properly denied.

Judgment affirmed.

SAWTELLE, Circuit Judge (dissenting).

The record shows that the trial court denied defendant's motion to suppress the ev-

idence upon the theory that the defendant's real residence was at Sandpoint and not at the place where the search was made.

As I understand the majority opinion, it concedes that the trial court erred in this respect, but sustains the verdict and judgment of guilty upon an entirely different theory, namely, that the officers were justified in making the arrest, having probable cause to believe that a felony was being committed in their presence, and that the search was incidental to the arrest. The opinion states that "it must be conceded that the search of a dwelling house, as such, for a still is not authorized by the terms of the National Prohibition Act"; that the difficulty encountered in the record "arises from the fact that the officers do not expressly claim to have entered the premises for the purpose of making an arrest but asserted that their purpose was to 'look for a still' "; and, further, "that it has been held that where the real intention of the officers in entering the premises was to make a search and not to make an arrest, the search is illegal although an arrest is actually made."

A careful study of the record, portions of which are quoted in the opinion, convinces me that the officers proceeded to the premises in question for the definite and declared purpose of making a search thereof, that the search was an unlawful one, and that the entry and search were not incidental to the arrest, but, on the contrary, the arrest was incidental to the unlawful search. In this connection, see quotation in the majority opinion from Raniele v. United States (C. C. A.) 34 F.(2d) 877. The officers were examined and cross-examined as to their purpose in visiting the premises, and, be it said to their credit, they repeatedly, consistently, and truthfully testified that their purpose and intention were "to find the still if possible." "We went up there to make an investigation of the place to see if the still was in operation."

One of the officers further testified: "I knocked on the kitchen door and received no response, and I had a short conversation with Mr. Hester and I knocked again without receiving any response. Then I turned the door knob and the door was not locked. I opened the door far enough so I could see part of the still through the kitchen door. I then opened the door enough to pass through."

As said by the Supreme Court in the case of Agnello v. United States, 269 U. S. 20, 32, 46 S. Ct. 4, 6, 70 L. Ed. 145, 51 A. L. R. 409:

"While the question has never been directly decided by this court, it has always been assumed that one's house cannot lawfully be searched without a search warrant, except as an incident to a lawful arrest therein. Boyd v. United States, 116 U. S. 616, 624, et seq., 630, 6 S. Ct. 524, 29 L. Ed. 746; Weeks v. United States, supra [232 U. S. 393, 34 S. Ct. 341, 58 L. Ed. 652, L. R. A. 1915B, 834, Ann. Cas. 1915C, 1177]; Silverthorne Lumber Co. v. United States, supra [251 U. S. 391, 40 S. Ct. 182, 64 L. Ed. 319]; Gouled v. United States, 255 U. S. 298, 308, 41 S. Ct. 261, 65 L. Ed. 647. The protection of the Fourth Amendment extends to all equally—to those justly suspected or accused, as well as to the innocent. The search of a private dwelling without a warrant is in itself unreasonable and abhorrent to our laws. Congress has never passed an act purporting to authorize the search of a house without a warrant. On the other hand, special limitations have been set about the obtaining of search warrants for that purpose. Thus, the National Prohibition Act, approved October. 28, 1919, c. 85, tit. 2, § 25, 41 Stat. 305, 315, provides that no search warrant shall issue to search any private dwelling occupied as such unless it is being used for the unlawful sale of intoxicating liquor or is in part used for business purposes, such as store, shop, saloon, restaurant, hotel, or boarding house. And later, to the end that government employees without a warrant shall not invade the homes of the people and violate the privacies of life, Congress made it a criminal offense, punishable by heavy penalties, for any officer, agent or employee of the United States engaged in the enforcement of any law to search a private dwelling house without a warrant directing such search. Act Nov. 23, 1921, c. 134, § 6, 42 Stat. 222, 223 [27 USCA §§ 53, 77]. Safeguards similar to the Fourth Amendment are deemed necessary and have been provided in the constitution or laws of every state of the Union. [See page 1268, Index Digest of state Constitutions (prepared for New York State Constitutional Convention Commission, 1915); also, section 8, c. 6, Consolidated Laws, New York, as amended by Laws 1923, c. 80.] We think there is no state statute authorizing the search of a house without a warrant; and in a number of state laws recently enacted for the enforcement of prohibition in respect of intoxicating liquors, there are provisions sim-

ilar to those in section 25 of the National Prohibition Act. Save in certain cases as incident to arrest, there is no sanction in the decisions of the courts, federal or state, for the search of a private dwelling house without a warrant. Absence of any judicial approval is persuasive authority that it is unlawful. See Entick v. Carrington, 19 Howell, State Trials, 1030, 1066. Belief, however well founded, that an article sought is concealed in a dwelling house, furnishes no justification for a search of that place without a warrant. And such searches are held unlawful notwithstanding facts unquestionably showing probable cause. See Temperani v. United States (C. C. A.) 299 F. 365; United States v. Rembert (D. C.) 284 F. 996, 1000; Connelly v. United States (D. C.) 275 F. 509; McClurg v. Brenton, 123 Iowa, 368, 372, 98 N. W. 881, 65 L. R. A. 519, 101 Am. St. Rep. 323; People v. Margolis, 220 Mich. 431, 190 N. W. 306; Childers v. Commonwealth, 198 Ky. 848, 250 S. W. 106; State v. Warfield, 184 Wis. 56, 198 N. W. 854. The search of Frank Agnello's house and seizure of the can of cocaine violated the Fourth Amendment.

"It is well settled that, when properly invoked, the Fifth Amendment protects every person from incrimination by the use of evidence obtained through search or seizure made in violation of his rights under the Fourth Amendment. Boyd v. United States [116 U. S. 630 et seq., 6 S. Ct. 524, 29 L. Ed. 746], supra; Weeks v. United States [232 U. S. 398, 34 S. Ct. 341, 58 L. Ed. 652, L. R. A. 1915B, 834, Ann. Cas. 1915C, 1177], supra; Silverthorne Lumber Co. v. United States [251 U. S. 391, 392, 40 S. Ct. 182, 64 L. Ed. 319], supra; Gouled v. United States [255 U. S. 306, 41 S. Ct. 261, 65 L. Ed. 647], supra; Amos v. United States, 255 U. S. 313, 316, 41 S. Ct. 266, 65 L. Ed. 654."

The majority opinion holds that, notwithstanding the officers' failure to testify that they went to the premises for the purpose of making an arrest, it must be presumed that they did so, and that it necessarily follows that the search was incidental to the arrest and therefore lawful.

It seems to me that it is going entirely too far to indulge in any such presumption. In fact, the testimony repels such a presumption and pushes it into the realm of speculation. If we are to indulge in presumption, would it not be more reasonable and consistent with the testimony to presume that the officers entered the premises to secure evidence upon which to base an application for the warrant of arrest? In view of the opinion of the Supreme Court in the Carroll Case, 267 U. S. 132, 45 S. Ct. 280, 69 L. Ed. 543, 39 A. L. R. 790, the express provision of section 25 of title 2 of the National Prohibition Act, the Fourth Amendment, and the testimony in this case, I am of the view that the judgment should be reversed.

We are here dealing with a principle which is of far greater importance than the punishment of any particular individual. In Go-Bart Importing Co. et al. v. United States, 282 U. S. 344, 357, 51 S. Ct. 153, 158, 75 L. Ed. 374, decided January 6, 1931, the Supreme Court said: "Since before the creation of our government, such [general] searches have been deemed obnoxious to fundamental principles of liberty. They are denounced in the constitutions or statutes of every State in the union. Agnello v. United States, 269 U. S. 20, 33, 46 S. Ct. 4, 70 L. Ed. 145, 51 A. L. R. 409. The need of protection against them is attested alike by history and present conditions. The Amendment is to be liberally construed and all owe the duty of vigilance for its effective enforcement lest there shall be impairment of the rights for the protection of which it was adopted. Boyd v. United States, 116 U. S. 616, 623, 6 S. Ct. 524, 29 L. Ed. 746; Weeks v. United States [232 U. S. 389, 392, 34 S. Ct. 341, 58 L. Ed. 652, L. R. A. 1915B, 834, Ann. Cas. 1915C, 1177], supra."